[No. 49713-8-I. Division One. February 18, 2003.]

THE STATE OF WASHINGTON, *Respondent*, v. THOMAS MULLIN-COSTON, *Appellant*.

*Chistopher Gibson* and *Catherine E. Glinski* (of *Nielsen, Broman & Koch, P.L.L.C.*), for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Lee D. Yates, Senior Deputy*, for respondent.

COLEMAN, J. — A jury convicted Thomas Mullin-Coston of premeditated first degree murder for his role in the strangling and stabbing death of 15-year-old Sarah Starling. A different jury previously convicted Mullin-Coston's codefendant of the lesser degree offense of second degree intentional murder. The primary issue presented on appeal is whether the doctrine of nonmutual collateral estoppel precludes the State from relitigating the codefendant's premeditation. We adhere to the rule, adopted in the overwhelming majority of jurisdictions, that nonmutual collateral estoppel does not apply in criminal proceedings. The policies of judicial economy and consistency that justify applying the doctrine in civil cases is outweighed in criminal cases by the public's interest in having each case decided on its merits.

Mullin-Coston also argues that the trial court erred in giving a misleading accomplice liability instruction and allowing witnesses to mention that he was in jail during conversations they had with him after he was arrested for the murder. We reject these arguments as well. The accom-

plice liability instruction the court used accurately mirrored the language of the accomplice liability statute. Further, the fact that Mullin-Coston was in jail was relevant and necessary contextual information, and the trial court did not abuse its discretion in concluding that its probative value outweighed its prejudicial effect. We affirm.

## FACTS

On March 9, 1999, 15-year-old Sarah Starling told her mother that she wanted to go meet her ex-boyfriend, Jason McDaniels, in order to bring closure to their relationship. Her mother did not want her to go, but Sarah insisted and her mother eventually relented. The next day, Sarah's body was found in Kingsgate Park. She had been strangled, beaten, and then killed by a stab wound to her neck.

McDaniels had lived with Sarah and her parents for a few weeks but moved out after he and Sarah had a fight. Mullin-Coston had been McDaniels' friend for several years, and on the night of the murder, they were socializing with friends at Anne-Marie Kalabany's apartment. McDaniels called Sarah from the apartment and asked her to meet him there. Before she arrived, Heather Fletcher overheard McDaniels calling Sarah a "bitch" and saying he "wanted to have her ass kicked." Mullin-Coston was in the room when McDaniels made those statements, but he did not say anything. According to Mullin-Coston's testimony, while he and McDaniels were smoking on the back porch of the apartment, McDaniels showed him a knife and said he was going to kill Sarah. Mullin-Coston said he did not take McDaniels seriously at the time. Sarah arrived at Kalabany's apartment at about 8 P.M., picked up Mullin-Coston and McDaniels, and left with them in her mother's car.

Mullin-Coston testified that after they left the house, they all went to a park and he took a walk while Sarah and McDaniels talked. They left the park, and on the way home Sarah missed the exit for Mullin-Coston's house. McDaniels

called her "stupid," and she began driving erratically. When they reached Kingsgate Park, McDaniels told her to pull over. He reached over from the passenger seat, shifted the automatic transmission into "park," and took the keys from the ignition. According to Mullin-Coston, the two exchanged a few words and then McDaniels began to choke her with both hands. He further testified that he sat in the back seat and watched as McDaniels choked Sarah to unconsciousness, but he did nothing to try to stop McDaniels. The State, however, presented the testimony of three witnesses who said Mullin-Coston admitted to them that he was the one who strangled Sarah. He said that after Sarah lost consciousness, McDaniels dragged her into the woods while he stayed in the car. Mullin-Coston said he did not see McDaniels stab Sarah or know for certain that McDaniels had killed her until McDaniels returned from the woods. Mullin-Coston also testified that he thought Sarah was dead when McDaniels pulled her from the car.

After leaving Sarah's body in the woods, Mullin-Coston and McDaniels went back to Kalabany's apartment. McDaniels told her that they had killed Sarah, and she helped them come up with a story to explain Sarah's disappearance. They decided they would tell the police that McDaniel's ex-girlfriend abducted Sarah by force. Meanwhile, Sarah's mother was waiting for her at the mall, where Sarah was supposed to pick her up after talking with McDaniel. At about 9:30 P.M., she called her daughter's pager, but Sarah did not answer. Shortly thereafter, McDaniels and Mullin-Coston arrived at the mall in Sarah's mother's car. She asked the two where Sarah was. They told her that McDaniels' ex-girlfriend had abducted Sarah. The two defendants then drove Sarah's mother to several places, supposedly looking for Sarah. Sarah's mother dropped them off at a friend's house and went home after about three hours.

Joe Eddie, a friend of Mullin-Coston's, testified that he was visiting a friend on the night of the murder when Mullin-Coston and McDaniels arrived and asked him for a

ride to Bothell. Eddie agreed. As they were driving, Mullin-Coston told Eddie that they had just killed a girl. Eddie did not believe him, so Mullin-Coston offered to show Eddie the body. Eddie declined. After they dropped McDaniels off, Eddie asked Mullin-Coston what happened. Mullin-Coston said he put the girl to sleep[1] and McDaniels stabbed her.

The morning after the murder, Mullin-Coston showed up at Eddie's house and they had another conversation. Mullin-Coston asked Eddie what to do. By then, Eddie had seen a helicopter and ambulance and believed Mullin-Coston's story. Mullin-Coston said if he was caught, he would blame everything on McDaniel. At trial, Mullin-Coston denied that he made any of the incriminating statements to which Eddie testified.

Kalabany testified that on the day after the murder, she had a conversation with Mullin-Coston in which she related statements McDaniels had told her about the murder. She told Mullin-Coston that McDaniels had told her that both of them killed Sarah. McDaniels had told her Mullin-Coston was in the back seat and reached up to put Sarah in a sleeper hold, rendering her unconscious. Then Mullin-Coston pulled her into the back seat, and McDaniels drove the car to a wooded area, dragged Sarah into the woods, and stabbed her. Kalabany testified that as she was relating this conversation to Mullin-Coston, he never contradicted her and was nodding his head. Mullin-Coston testified that he never meant to agree with Kalabany during this conversation. He said he did not deny involvement at that point because he was "just basically listening to what she was saying, taking it in."

Another witness, Heather Fletcher, testified that she and Mullin-Coston went to McDonalds to eat at about 9 P.M. the day after the murder. She had been with Kalabany and the two defendants throughout the night, but according to her testimony, she did not yet know what had happened. She asked Mullin-Coston what was going on as they were

---

[1] Eddie and another witness testified that they had previously seen Mullin-Coston render other people unconscious using a technique they called a "sleeper hold."

waiting in the drive-through. He told her that he had put Sarah in a "sleeper," she passed out, and then McDaniels dragged her into the woods in Kingsgate Park. He said McDaniels stabbed Sarah with a knife. She asked him why they did it, and he said he did not know.

Sarah's body was found at about 5 P.M. on the day after she died. Later that evening, Kalabany, Fletcher, and Jennifer Wirkman, another friend who knew about the defendants' involvement in the murder, all went to the police. Kalabany later identified the murder weapon as one of her kitchen knives, which had disappeared from her apartment on the night of the murder.

Police arrested Mullin-Coston and McDaniels. Fletcher testified that she visited both defendants several times after they were arrested. Mullin-Coston also called Eddie from jail and told him that McDaniels was going to try to say that Mullin-Coston committed the murder. Mullin-Coston said that he would tell the police where the murder weapon was located and say he did not have anything to do with it. He also asked Eddie to call the jail and find out McDaniels' whereabouts. Eddie called the police instead and gave them a statement. Mullin-Coston called Eddie again shortly before trial and told him he was going to do his time and that he was not mad at Eddie.

The State charged both defendants with first degree premeditated murder. The trials were severed, and McDaniels was tried first. He claimed Mullin-Coston strangled Sarah and then forced him to stab her at gunpoint while she was unconscious. The jury convicted him of the lesser degree offense of second degree intentional murder. The jury left the verdict form blank with regard to first degree murder. After a separate trial, a different jury convicted Mullin-Coston of first degree murder.

## ANALYSIS

### 1. Collateral Estoppel

■ ■ Mullin-Coston argues that by convicting McDaniels of second degree intentional murder rather than

premeditated first degree murder, the jury necessarily found that McDaniels did not act with premeditated intent. Accordingly, Mullin-Coston asserts that the State was barred in his trial from relitigating the issue of McDaniels' premeditation. He further argues that in failing to so instruct the jury, the court omitted an essential element of the offense, and that his attorney provided ineffective assistance by failing to argue this issue at trial. We reject these arguments because we hold that issues decided by one defendant's jury are not binding on juries in later trials of a codefendant.

The doctrine of collateral estoppel prohibits relitigation of certain issues that have already been decided against a party. *State v. Bryant*, 146 Wn.2d 90, 98, 42 P.3d 1278 (2002). The party seeking to enforce the rule must show that (1) the issue decided in the prior adjudication is identical to the one presented in the second, (2) the prior adjudication ended in a final judgment on the merits, (3) the party against whom the plea of collateral estoppel is asserted was a party or in privity with a party to the prior litigation, and (4) the doctrine's application will not work an injustice. *Bryant*, 146 Wn.2d at 98-99 (citing *State v. Williams*, 132 Wn.2d 248, 254, 937 P.2d 1052 (1997)).

In the criminal context, principles of collateral estoppel are generally embodied in constitutional protections against double jeopardy. *Williams*, 132 Wn.2d at 254 (citing *Ashe v. Swenson*, 397 U.S. 436, 446, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970)). That is, where the State has failed to prove its case against a defendant in a criminal proceeding, it is prohibited from relitigating against the same defendant issues that were decided in the first trial. *Ashe*, 397 U.S. 436 at 446 (holding man acquitted of robbery of one victim could not be prosecuted for robbing second victim of same robbery; State failed to prove identity in first case and could not relitigate issue). But constitutional protections are not implicated here because Mullin-Coston was not put in jeopardy by the previous case against his accomplice,

McDaniels. Thus, the question of whether to apply collateral estoppel is not a constitutional issue, but a matter of weighing competing public policies. *See Standefer v. United States*, 447 U.S. 10, 22-23, 100 S. Ct. 1999, 64 L. Ed. 2d 689 (1980). *See also State v. Gonzalez*, 75 N.J. 181, 188, 380 A.2d 1128 (1977) (noting that "no constitutional command is implicated here since the defendant had not been placed in jeopardy in the [previous] hearing[,]" but going on to hold that nonmutual collateral estoppel should apply in limited circumstances).

Traditionally, collateral estoppel did not apply unless both parties were the same or in privity with the parties to the prior proceeding. *See* Case Comments, *The Use of Nonmutual Collateral Estoppel by Criminal Defendants*: United States v. Standefer, 93 HARV. L. REV. 804, 804 (1980) (citing 1B JAMES WILLIAM MOORE, FEDERAL PRACTICE, ¶¶ 0.411, .412(d) (2d ed. 1974)). In civil cases, courts in Washington and most other jurisdictions have relaxed this "mutuality" requirement, so that only the party against whom estoppel is asserted must have been a party in the prior proceeding. *See, e.g., City of Seattle, Executive Servs. Dep't v. Visio Corp.*, 108 Wn. App. 566, 577, 31 P.3d 740 (2001) (estopping city from relitigating trial court's decision that identically situated software company was not "manufacturer" as defined by city's tax ordinance). But no Washington court has decided whether nonmutual collateral estoppel applies in criminal cases.

The United States Supreme Court and the overwhelming majority of courts in other states[2] have held that issues decided against one defendant have no effect on trials

---

[2] *See, e.g., State v. Arevalo*, 2002 NMCA 62, 132 N.M. 306, 47 P.3d 866, 871, *cert. denied* (N.M. 2002); *People v. Palmer*, 24 Cal. 4th 856, 15 P.3d 234, 103 Cal. Rptr. 2d 13, *cert. denied by Price v. California*, 532 U.S. 1055 (2001); *Reid v. State*, 719 N.E.2d 451, 456 (Ind. Ct. App. 1999); *People v. Hall*, 279 Ill. App. 3d 602, 664 N.E.2d 1122, 216 Ill. Dec. 194 (1996) (holding nonmutual collateral estoppel inapplicable to evidentiary ruling by court); *State v. Secret*, 246 Neb. 1002, 524 N.W.2d 551 (1994), *overruled on other grounds by State v. Burlison*, 255 Neb. 190, 583 N.W.2d 31 (1998); *People v. Allee*, 740 P.2d 1, 10 (Colo. 1987); *Kott v. Alaska*, 678 P.2d 386, 393 n.10 (1984) (citing *State v. Jimenez*, 130 Ariz. 138, 634 P.2d 950 (1981); *State v. Wilson*, 236 Iowa 429, 19 N.W.2d 232 (1945); *Commonwealth v. Scala*, 8 Mass. App. Ct. 202, 392 N.E.2d 869 (1979); *Larsen v. State*, 93 Nev. 397,

against codefendants in later prosecutions. In *Standefer*, the Supreme Court held that the policies justifying nonmutual collateral estoppel in civil cases were outweighed in criminal cases by competing policy considerations:

> First, in a criminal case, the Government is often without the kind of "full and fair opportunity to litigate" that is a prerequisite of estoppel. Several aspects of our criminal law make this so: the prosecution's discovery rights in criminal cases are limited, both by rules of court and constitutional privileges; it is prohibited from being granted a directed verdict or from obtaining a judgment notwithstanding the verdict no matter how clear the evidence in support of guilt; it cannot secure a new trial on the ground that an acquittal was plainly contrary to the weight of the evidence, and it cannot secure appellate review where a defendant has been acquitted.

*Standefer*, 447 U.S. at 22 (citations omitted).

The Court also noted that jury verdicts may be the result of compassion or compromise, and the admissibility of different evidence against different defendants would make case-by-case determinations of estoppel "protracted and burdensome." *Standefer*, 447 U.S. at 24. The Court held that these " 'competing policy considerations' " outweighed

---

566 P.2d 413 (1977); *People v. Felton*, 95 Misc. 2d 960, 408 N.Y.S.2d 646 (1978); *City of Cleveland v. Ryan*, 106 Ohio App. 110, 148 N.E.2d 691 (1958)); *People v. Paige*, 131 Mich. App. 34, 345 N.W.2d 639 (1983) (per curiam) (holding conviction of principal for lesser crime of second degree murder did not preclude conviction of accomplice for first degree murder); *State v. Olson*, 478 N.W.2d 218, 221 (Minn. Ct. App. 1991). *See generally*, 9 A.L.R.3d 203 (1966).

Of the handful of appellate decisions that have applied nonmutual estoppel in criminal cases, all but one have been overruled or reversed. *See Gonzalez*, 380 A.2d at 1132. Further, that case is not persuasive here. In *Gonzalez*, the New Jersey Supreme Court held that the doctrine of nonmutual collateral estoppel could be applied to criminal cases in very limited circumstances and on a case-by-case basis. In that case, the defendant attempted to join his codefendant's pretrial hearing and was unable to do so. The court indicated that the State would not be estopped from relitigating the issue if the defendant had resisted joinder or failed to seek joinder in a timely manner. There is no evidence that Mullin-Coston sought joinder in this case, and this case concerns a jury verdict, which cannot be appealed, rather than a pretrial ruling of a judge.

the "economy concerns that undergird the estoppel doctrine." *Standefer*, 447 U.S. at 25.[3]

We agree with the Supreme Court's reasoning in *Standefer*. Three chief concerns support the doctrine of collateral estoppel: (1) avoiding harassment of litigants by repetitive proceedings, (2) judicial economy, and (3) consistency of outcomes. *See State v. Dupard*, 93 Wn.2d 268, 272, 609 P.2d 961 (1980). But these policies control only in the absence of more important countervailing policies. For this reason, even where both parties are identical, Washington courts have consistently declined to apply collateral estoppel to bar relitigation of issues in criminal prosecutions. *See State v. Tili*, 148 Wn.2d 350, 60 P.3d 1192 (2003) (holding collateral estoppel inapplicable to sentencing court's decision not to impose exceptional sentence); *Bryant*, 146 Wn.2d at 98 (noting "Washington courts have never barred a criminal prosecution on the grounds of collateral estoppel."); *Williams*, 132 Wn.2d at 254 (declining to give preclusive effect to administrative decision on issue of intent to receive welfare benefits); *State v. Cleveland*, 58 Wn. App. 634, 794 P.2d 546 (1990) (dependency petitions); *Dupard*, 93 Wn.2d at 277 (parole revocation hearings).

Further, an examination of each of the policies supporting collateral estoppel demonstrates that they are outweighed in criminal cases where different defendants are involved. First, " 'there is no question of harassment by successive prosecutions of one who is tried but once, though a co-defendant might earlier have been tried.' " *Kott v. Alaska*, 678 P.2d 386, 393 (Alaska 1984) (rejecting nonmutual collateral estoppel in criminal cases) (quoting *State v. Kott*, 636 P.2d 622, 626 (Alaska Ct. App. 1981). Second, the policy of judicial economy would not be served

---

[3] In particular, the Court noted that the government interest in enforcement of criminal law distinguishes criminal cases from civil cases in which private litigants, not society, are primarily subjected to the preclusive consequences of estoppel in the interests of finality and consistency. "In such cases, no significant harm flows from enforcing a rule that affords a litigant only one full and fair opportunity to litigate an issue, and there is no sound reason for burdening the courts with repetitive litigation." *Standefer*, 447 U.S. at 24.

by applying the doctrine to criminal cases because of the numerous additional issues it would raise, such as the admissibility of different evidence against different defendants, *see Standefer*, 447 U.S. at 24, and the tactical advantage a codefendant would gain by being the last to be tried. Arguably, the third rationale—consistency—is the most compelling in criminal cases. *Accord, Commonwealth v. Brown*, 473 Pa. 458, 466, 375 A.2d 331, 335 (1977) (noting it "is inconsistent and seemingly unfair to hold a defendant liable for the conduct of another, when the actor himself has been exonerated . . ." but holding nonmutual estoppel inapplicable in criminal cases due to stronger countervailing policies). But although the appearance of fairness may be served by consistency in judicial outcomes, the policies against nonmutual collateral estoppel, which *Standefer* examined in great detail, far outweigh that concern. Perhaps the most compelling of these countervailing policies is the fact that the findings of criminal juries in a defendant's favor cannot be challenged, so if one jury's finding is erroneous or based on sympathy or prejudice, the application of collateral estoppel would give preclusive effect to that finding in perpetuity and without remedy. *Cf. Visio Corp.*, 108 Wn. App. at 577 (applying nonmutual collateral estoppel in civil case, in part because city knew case was pending yet chose not to appeal prior decision). As the *Standefer* Court wisely acknowledged, one of the tradeoffs of the jury system is that criminal juries are imperfect and reach inconsistent results. The State must live with the consequences of this system and may not rely on issues decided against one defendant when prosecuting a codefendant in a severed trial, even if that means the second defendant receives more lenient treatment from the jury. We see no reason to apply a different rule in favor of defendants.

Further, the Washington legislature has already weighed the competing policy considerations presented in this case and determined that, in criminal cases, having each case resolved on its merits is more important than consistency of

outcomes. Under RCW 9A.08.020(6), a principal's acquittal or conviction on a lesser charge does not bar prosecution of the accomplice.[4] Mullin-Coston argues that RCW 9A.08-.020(6) does not apply in this case because he is not seeking to preclude prosecution altogether, but only the issue of his accomplice's premeditation. But although RCW 9A.08.020(6) might not directly address Mullin-Coston's situation, it demonstrates the legislature's intent that a jury's prior decision with regard to the principal should not affect the prosecution of the accomplice. Further, Mullin-Coston's proposed rule would inevitably result in dismissal of some cases in which the issue sought to be precluded would be dispositive. Such a result would clearly contravene the legislative policy choice reflected in RCW 9A.08.020(6).

We hold that issues decided against the State in a previous trial have no effect on later trials involving different defendants.[5] Accordingly, the trial court properly instructed the jury on the elements of the crime. Further, Mullin-Coston's ineffective assistance of counsel claim fails because he cannot show that his attorney's failure to argue collateral estoppel was unreasonable. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Thomas*, 109 Wn.2d 222, 743 P.2d 816 (1987).

2. Accomplice Instruction

Mullin-Coston argues that the trial court erroneously instructed the jury on accomplice liability. This argument is not persuasive. The trial court's instruction accurately mirrored the accomplice liability statute and was not mis-

---

[4] RCW 9A.08.020(6) states: "A person legally accountable for the conduct of another person may be convicted on proof of the commission of the crime and of his complicity therein, though the person claimed to have committed the crime has not been prosecuted or convicted or has been convicted of a different crime or degree of crime or has an immunity to prosecution or conviction or has been acquitted."

[5] Because we side with the overwhelming majority of jurisdictions in holding nonmutual collateral estoppel to be inapplicable in criminal cases, we need not analyze whether the individual elements of the doctrine are satisfied in this case.

leading. The court's instruction, therefore, was not erroneous.

■ ■ Criminal jury instructions are adequate if they accurately state the law, permit each side to argue its theory of the case, and are not misleading. *State v. Clark*, 143 Wn.2d 731, 24 P.3d 1006, *cert. denied*, 534 U.S. 1000 (2001). Washington's accomplice liability statute permits the jury to convict a defendant as an accomplice to the principal crime only when the defendant knew that he or she was promoting or facilitating "the crime." RCW 9A.08.020; *State v. Cronin*, 142 Wn.2d 568, 579, 14 P.3d 752 (2000); *State v. Roberts*, 142 Wn.2d 471, 510, 14 P.3d 713 (2000). *Cronin* and *Roberts* held that it is error to instruct the jury that it can convict a defendant as an accomplice if the defendant knew his actions would promote or facilitate the commission of "a crime," because such an instruction could lead the jury to believe that it could convict a defendant who unknowingly facilitated the crime charged as long as the defendant knew some crime was going to occur. But in reaching this decision, the Supreme Court reaffirmed its holding in *State v. Davis*, 101 Wn.2d 654, 656, 682 P.2d 883 (1984), which approved of an instruction that mirrored the language of the accomplice liability statute. *Roberts*, 142 Wn.2d at 512.

In this case, the accomplice liability instruction mirrored the accomplice liability statute by requiring knowledge that the defendant's participation would promote or facilitate the commission of "the crime." Court's instruction to the jury No. 13; RCW 9A.08.020. Mullin-Coston argues that the trial court should have given his proposed instruction, which stated that he was an accomplice if he knew his participation would "promote or facilitate the commission of the crime of murder in the first degree . . . ." He argues that without adding the words "of first-degree murder" after the words "the crime," the instruction still misled the jury regarding the degree of knowledge required.

We hold that a trial court need not reference the charged crime in an accomplice liability instruction; it is sufficient to

instruct the jury with language from the accomplice liability statute. The given instruction contained the exact language approved by the Supreme Court in *Roberts*, 142 Wn.2d at 512. The instruction was therefore legally accurate, was not misleading, and allowed Mullin-Coston to argue his theory of the case. The extra language proposed by Mullin-Coston was neither necessary nor preferable to an instruction that mirrors the statute.[6]

### 3. Testimony Regarding Custody

■ Finally, Mullin-Coston argues that the trial court abused its discretion in allowing the jury to hear that he was in jail during certain conversations with State witnesses. We disagree. Mullin-Coston's analogy to cases in which defendants appeared in physical restraints is unpersuasive; the fact that a defendant was in jail pending a murder trial does not carry the same inherent prejudice as the sight of a defendant in shackles. Further, the trial court acted within its discretion when it determined that the probative value of the defendant's custody status outweighed any prejudicial effect.

A criminal defendant is guaranteed a fair and impartial trial by the fourth and fourteenth amendments to the United States Constitution and article I, sections 3 and 22 of the Washington State Constitution. A part of this guarantee is the presumption of innocence. *State v. Finch*, 137 Wn.2d 792, 844, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999). In *Finch*, the court reaffirmed the long-held principle that the right to a fair trial can be violated where a defendant appears before the jury in physical restraints. "Measures which single out a defendant as a particularly

---

[6] In fact, we note that the proposed instruction appears to be inconsistent with our cases regarding accomplice liability. A defendant charged as an accomplice to first degree murder may be convicted on proof that he knew generally he was facilitating a homicide, but need not have known that the principal had the kind of culpability required for any particular degree of murder. *In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001). To the extent that the proposed instruction would require knowledge of first degree murder rather than merely homicide, it goes too far. The trial court wisely adhered to the language of the accomplice liability statute, as approved by *Cronin* and *Roberts*, rather than embellishing in the manner proposed by defense counsel.

dangerous or guilty person[, such as physical restraint or shackling], threaten his or her constitutional right to a fair trial." *Finch*, 137 Wn.2d at 845. Courts from other states have held that the same right is violated by reference to a defendant's in-custody status. *See, e.g., Haywood v. State*, 107 Nev. 285, 288, 809 P.2d 1272, 1273 (1991) (per curiam).

Mullin-Coston argues that his right to a fair trial was violated when the jury was allowed to hear that he was in jail during certain conversations he had with witnesses after his arrest. Four conversations are at issue. The first occurred when State witness Heather Fletcher visited Mullin-Coston in jail, and the second occurred when he called her from jail. Mullin-Coston also called State witness Eddie twice from jail. In the first call, he asked Eddie to help him find out where his codefendant McDaniels was incarcerated. In the second call, Mullin-Coston called to say that he knew Eddie was testifying for the prosecution and to tell Eddie that he was not angry with him and would do his time. At trial, Mullin-Coston's attorney objected to the admissibility of these conversations on the basis that their prejudicial effect would outweigh their probative value. Mullin-Coston now asks this court to hold, by analogy to physical restraint cases, that the trial court violated his right to a fair trial by allowing the witnesses to mention that he was in jail pending trial.

But although references to custody can certainly carry some prejudice, they do not carry the same suggestive quality of a defendant shackled to his chair during trial. Jurors must be expected to know that a person awaiting trial will often do so in custody. Many factors go into the determination of whether a defendant will be released pending trial, including the seriousness of the charged crime and the person's ability to pay bail. In this case, a reasonable juror would know that a defendant in a first degree murder trial was not likely to be released pending trial unless he paid a substantial amount of bail, regardless of whether he was later found to be innocent. In contrast, shackling a defendant during trial sends the message to the

jury that the judge, corrections officers, and security personnel present fear the defendant or think he might leap from his chair at any point and cause harm to someone in the courtroom. That is a much stronger prejudice than a reference to the fact that a defendant was in jail on the same charge for which he is being tried.[7] Accordingly, Mullin-Coston's analogy to physical restraint cases is misplaced, and cases from other states that have drawn the same analogy are not persuasive. *See Haywood*, 809 P.2d at 1273.[8]

Further, although a trial court that admits such testimony might abuse its discretion under ER 403 where the probative value is slight and the prejudice is great, the trial court properly admitted the evidence in this case.[9] With regard to Fletcher's testimony, her credibility was at issue because Mullin-Coston denied the conversation in the McDonald's drive-through, during which he allegedly admitted to choking Sarah. The fact that Fletcher was a close enough friend of Mullin-Coston's to visit him in jail was relevant to show lack of bias and rebut the claim of fabrication raised by the defense. With regard to Eddie's

---

[7] Obviously, a greater amount of prejudice would inhere if the jury were told that the defendant was previously incarcerated for another crime, especially if that crime were not admissible under ER 404(b) or ER 609. Here, however, the testimony concerned the defendant's custody on the instant charge. It is also notable that Mullin-Coston did not ask for a limiting instruction, indicating that even trial counsel did not view the references as critically prejudicial at the time.

[8] Certainly, the State should not mention that a defendant is or was in jail without first giving the trial court an opportunity to weigh that information's probative value against its prejudicial effect. Here, the State properly addressed the issue outside the presence of the jury. *Cf. Haywood*, 809 P.2d at 1273 (holding prosecutor improperly brought up jail visits for first time during cross-examination, but no prejudice resulted); *State v. Carroll*, 109 Nev. 975, 860 P.2d 179, 180 (1993) (holding inadvertent reference to in-custody status improper *after* court excluded such reference in limine, but finding no prejudice); *State v. Harrison*, 136 Idaho 504, 37 P.3d 1 (2001) (holding references to in-custody status during cross-examination "inappropriate," but harmless).

[9] Even a claim of unconstitutional use of restraints is subject to an abuse of discretion standard and harmless error analysis. *State v. Elmore*, 139 Wn.2d 250, 985 P.2d 289 (1999) (citing *Finch*, 137 Wn.2d 859-62.) *See also Haywood*, 809 P.2d at 1273 (holding references to in-custody status harmless beyond a reasonable doubt). Thus, even if we accepted Mullin-Coston's analogy and treated this as an issue of constitutional magnitude, he would not prevail on the facts presented.

testimony, Mullin-Coston's request for Eddie's help in locating McDaniels would make no sense unless the jury understood that Mullin-Coston was unable to get that information himself due to his incarceration. Under these circumstances, the trial court properly concluded that Mullin-Coston's custody status was more probative than prejudicial.

## CONCLUSION

We hold that the doctrine of collateral estoppel does not apply to issues decided against separate criminal defendants. We also hold that a trial court need not reference the charged crime in an accomplice liability instruction; it is sufficient to instruct the jury with language from the accomplice liability statute. Finally, we hold that references to Mullin-Coston's custody status were properly admitted in this case. Mullin-Coston's conviction is affirmed.

BECKER, C.J., and BAKER, J., concur.

Review granted at 150 Wn.2d 1001 (2003).